# 19-11079

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

**UNITED STATES OF AMERICA,**
Plaintiff-Appellee

v.

**MICHAEL DASEAN ROBINSON,**
Defendant-Appellant

On Appeal from the United States District Court
For the Northern District of Texas
Fort Worth Division
District Court No. 4:19-CR-098-A

**APPELLEE'S BRIEF**

Erin Nealy Cox
United States Attorney

Brian McKay
Assistant United States Attorney
Texas Bar No. 24046395
1100 Commerce Street, Third Floor
Dallas, Texas 75242
Telephone:  (214) 659-8600
brian.mckay@usdoj.gov

Attorneys for Appellee

# STATEMENT REGARDING ORAL ARGUMENT

The district court cited a long list of reasons why a substantial upward-variance sentence was necessary in this case. Robinson argues that the district court imposed a substantively unreasonable sentence by considering one of those reasons—a suicide prompted by a girlfriend's fatal overdose of drugs supplied by Robinson. Even if the court reviews the argument for abuse of discretion, the district court's thorough explanation about the reasons for its sentence refutes Robinson's assertion that the sentence, which was more than a decade below the statutory maximum, was substantively unreasonable. The government does not believe oral argument would materially assist the Court in resolving this appeal.

# TABLE OF CONTENTS

**Page**

STATEMENT REGARDING ORAL ARGUMENT....................................i

TABLE OF AUTHORITIES .........................................................iii

STATEMENT OF JURISDICTION............................................. 1

STATEMENT OF THE ISSUE ................................................. 1

STATEMENT OF THE CASE.................................................. 1

    1.    Robinson operated a "virtual supermarket" of drugs for years...... 1

    2.    Robinson pled guilty, and the district court imposed a substantial upward-variance sentence .......................................................... 3

SUMMARY OF THE ARGUMENT........................................... 12

ARGUMENT AND AUTHORITIES .......................................... 14

    1.    The district court did not abuse its discretion in selecting the sentence imposed.................................................... 14

        A.    In imposing a variance sentence, the district court cited numerous reasons relevant to the statutory sentencing factors ........................................................... 16

        B.    Robinson's argument asks the Court to reweigh a single aspect of the sentencing factors and come to a different conclusion about an appropriate sentence ........................ 18

CONCLUSION................................................................. 22

CERTIFICATE OF SERVICE ................................................. 22

CERTIFICATE OF COMPLIANCE ........................................... 23

# TABLE OF AUTHORITIES

**Federal Cases**      **Page(s)**

*Holguin-Hernandez v. United States*, 140 S. Ct. 762 (2020) ............................. 14

*United States v. Diehl*, 775 F.3d 714 (5th Cir. 2015) ....................................... 15

*United States v. Nevarez-Arreola*, 885 F.2d 243 (5th Cir. 1989) ........................ 17

*United States v. Nguyen*, 854 F.3d 276 (5th Cir. 2017) .................................... 15

*United States v. Oladimeji Seun Ayelotan,* 917 F.3d 394 (5th Cir.),
*cert. denied,* 140 S. Ct. 308 (2019) ................................................................. 21

**Federal Statutes and Rules**

18 U.S.C. § 3231 ........................................................................................ 1

18 U.S.C. § 3742(a) .................................................................................... 1

Fed. R. App. P. 4(b) .................................................................................... 1

## STATEMENT OF JURISDICTION

This is a direct appeal from a sentence in a criminal case.  The district court had jurisdiction under 18 U.S.C. § 3231, and this Court has jurisdiction under 18 U.S.C. § 3742(a).  The district court entered its judgment on September 26, 2019.  (ROA.6, 119.)  Robinson timely filed the notice of appeal the following day.  Fed. R. App. P. 4(b).  (ROA.124.)

## STATEMENT OF THE ISSUE

The district court considered numerous factors when it imposed a substantial upward-variance sentence for a heroin dealer, including the overdose death of an 18-year-old woman that resulted from a drug he supplied.  Did the district court impose a substantively unreasonable sentence by also taking into account the suicide of that victim's boyfriend, whose death was precipitated by her overdose?

## STATEMENT OF THE CASE

### 1.    Robinson operated a "virtual supermarket" of drugs for years.

Michael Desean Robinson had already been imprisoned for a drug-trafficking conviction once before when, in November 2018, the Drug Enforcement Administration advanced an investigation into his drug-dealing activities.  (ROA.365, 374.)  Agents used undercover buys to purchase heroin and cocaine from him, and a search warrant at his home yielded heroin,

cocaine, marijuana, and digital scales with drug residue on them. (ROA.366.) Investigators determined that he also sold methamphetamine. (*See* ROA.147.)

Using informants, information from phones seized from Robinson during the investigation, and other investigative techniques, agents were able to outline the scale of Robinson's drug-dealing operation. One of his customers reported buying cocaine and heroin from him more than 100 times since 2016. (ROA.366.) Robinson annotated customer contact information in his phone by the drugs they bought, categorizing them by street names for heroin, powder cocaine, crack cocaine, or methamphetamine. (ROA.147, 367.) Robinson operated what the district court would later call a "virtual supermarket of different kinds of drugs[.]" (ROA.310.) And based on text messages and other information in his phones, investigators estimated that he supplied about 100 heroin customers, 80 cocaine customers, 25 crack cocaine customers, and 25 methamphetamine customers. (ROA.367.) Robinson also had a number of customers for "high-grade" marijuana. (ROA.367.)

One of Robinson's numerous heroin customers had been 18-year-old Reed Bartosh. (*See* ROA.147, 149, 303, 371.) In November 2017, Bartosh and his 18-year-old girlfriend, Brianna Flood, drove to an apartment complex, where they met Robinson and purchased $40 worth of heroin. (*See* ROA.303,

357, 371.)[1]  Bartosh would later tell Flood's mother that it was Flood's first time to use heroin and that he injected her because she was scared of needles. (ROA.415.)  Flood soon began reporting poor vision and ringing in her ears, but Bartosh, suffering his own effects of the drug, apparently thought little of it. (*See* ROA.357, 415.)  Bartosh woke the next morning to find that Flood had died of an overdose.  (ROA.371, 415.)

Flood's death sent Bartosh into a downward spiral.  He told Flood's mother after the funeral that Flood was the only person he truly loved and that he would not live after that event.  (ROA.415.)  He immediately did a stint in rehab, but Robinson was there to continue supplying him with heroin when he was released.  (*See* ROA.305, 371, 417.)  An acquaintance who visited a hotel room where Bartosh was living about a month after her death noticed that he had set up a shrine with Flood's picture and candles.  (ROA.307.)  On July 22, 2018, Bartosh's father found his body in a house next door, slumped over beside a rifle.  (ROA.371, 419.)  Bartosh died by suicide.  (ROA.371.)

## 2.    Robinson pled guilty, and the district court imposed a substantial upward-variance sentence.

Robinson was arrested in early 2019 on a federal complaint and pled guilty to an information charging him with one count of conspiracy to possess

---

[1] Robinson is sometimes referred to in the record by his nickname, "Tite" or "Tite Mike."  (*See* ROA.271, 305-06.)

with intent to distribute at least 100 grams of heroin. (ROA.34, 44-45, 210; *see* ROA.8-24.) Based largely on undercover purchases, informants, and evidence of transactions in Robinson's phones, the presentence investigation report ("PSR") calculated a total converted drug quantity of approximately 811 kilograms. (ROA.367-69.) It pointed out, though, that the drug amount based on text-message transactions was conservative because it did not add any quantities based on conversations evidencing that a transaction occurred but that were unclear about the customer, drug type, or quantity transacted. (ROA.367.)

The PSR also noted some of the marketing techniques Robinson used to expand his operation. Text messages revealed that he directed others on how to distribute drugs and how to cultivate new customers for him. (ROA.367.)[2] Robinson even instructed his girlfriend to find recovering addicts at local methadone clinics and pass out his phone number to get new customers. (ROA.367-68.)

The PSR imposed the two-level dangerous-weapon enhancement in USSG § 2D1.1(b)(1) based on information that Robinson kept a shotgun nearby in drug transactions. (ROA.370.) Additionally, Robinson's phone

---

[2] Bartosh told police that, on the day he bought the fatal heroin, Robinson texted him to let him know that Robinson would provide free drugs if he sent new customers to buy drugs from Robinson. (ROA.357.)

contained evidence that he sold two semiautomatic handguns, which he could not legally possess as a convicted felon. (ROA.372.) The PSR imposed two additional two-level enhancements, one for maintaining a premises for the distribution of drugs and the other for his supervisory role in the offense. (ROA.370-31.) The PSR computed an advisory guideline range of 151 to 188 months, but it noted that a higher sentence could be appropriate based on Robinson's criminal history's underrepresentation of risk. (ROA.383, 385-86.) The PSR said that an above-guidelines sentence also could be fitting to reflect serious circumstances not taken into consideration by the guidelines, specifically Robinson's provision of the heroin that resulted in Flood's death and his unlawful possession and sales of firearms. (ROA.385-86.)

Robinson objected to the PSR's finding that his "drug trafficking activities resulted in the death of Brianna Flood" and argued that the information should not be used as a basis for an upward departure or variance. (ROA.388.) The gravamen of his objection was that Flood's death could not be a basis for an increased sentence unless there was proof that the heroin he supplied was a but-for cause of Flood's death, which Robinson argued was not shown by the evidence. (ROA.388-91.) Additionally, Robinson suggested that Bartosh was an intervening actor who terminated any responsibility Robinson had because Bartosh purchased, diluted, and injected the lethal drug.

(ROA.392.)  The government responded, supporting the court's ability to take the overdose death into account and also noting that Bartosh's "suicide clearly related to [Flood's] overdose death."  (ROA.403-04.)

Prior to sentencing, the court entered an order notifying the parties that it tentatively concluded that Robinson "should receive a sentence of imprisonment significantly above the top of his advisory guideline imprisonment range."  (ROA.75.)  It further stated that it would be taking into consideration documents the probation officer relied on to make the findings and conclusions contained in the PSR "relative to the relationship between the sale by the defendant to Reed Bartosh of heroin and the death of Brianna Flood and, ultimately, the death of Reed Bartosh."  (ROA.75.)  Those documents included such things as the Flood autopsy report, victim letters from Flood's mother and both of Bartosh's parents, police reports pertaining to Flood's death and a handwritten statement given by Bartosh, the criminal complaint against Robinson, and certain investigation reports.  (ROA.75-77.)  The court also advised the parties that it was taking judicial notice of certain information concerning the increase in heroin-related deaths in the country.  (ROA.77; *see* ROA.79-80.)  It later supplemented its notice to identify several additional pages of a report—the 2018 National Drug Threat Assessment—of which it took judicial notice for sentencing.  (ROA.94-109.)

At the hearing, Robinson reiterated his objection to the court's consideration of Flood's death for sentencing based on his argument that he was not a but-for cause of her death. (ROA.281-82.) The parties appeared, ready to present their respective experts to opine on that issue. Robinson presented the medical examiner for Nueces County, Texas, who believed that a preexisting heart condition contributed to Flood's death and would not say with certainty that the victim died of heroin use (as opposed to morphine use). (ROA.228, 234-35, 256-57.) Assuming the victim took heroin, though, he acknowledged that it was the immediate cause of Flood's death. (ROA.175-76.) After the court heard that testimony, it overruled Robinson's objection but allowed the government to present its witnesses. (ROA.282-84.)

The government called Dr. Susan Roe, a deputy medical examiner in Tarrant County, to verify her conclusions concerning Flood's death. (ROA.284-85, 295.) The government also presented Dr. Robert Johnson, chief toxicologist for the Tarrant County Medical Examiner's Office. (ROA.296.) Among other things, he testified that heroin accounted for about one-third of the 285 fatal overdoses in Tarrant County in 2018 and said no other drug came close to that percentage. (ROA.299-300.)

After receiving all of the evidence, the court reiterated that it was denying Robinson's objection, finding beyond a reasonable doubt—while

explicitly recognizing that the relevant standard was lower—that Flood would not have died when she did but for the heroin in her system.  (ROA.300-01.) "In other words, the heroin was a but-for . . . cause of the death of Brianna Flood."  (ROA.301.)

Turning to a "related issue," the court found that the heroin that caused Flood's death also led to Bartosh's death.  (ROA.301.)  The court recounted the many pieces of evidence it considered to reach that conclusion and explained "why [it] reached the conclusion that the injection by Brianna Flood led to the death of Reed Bartosh."  (ROA.302.)  It noted Bartosh's statements to Flood's mother manifesting his despair after her death, which the court interpreted to mean that his decision to end his life was made because of the guilt he felt over Flood's death.  (ROA.303.)

The court also acknowledged the victim impact letter written by Bartosh's mother, in which she requested the longest possible sentence and noted her observation that Bartosh "deteriorated drastically with depression and heroin" after Flood's death, before taking his life.  (ROA.304.)  Based on the evidence it had received, the court concluded that one of the things that weighed on Bartosh was the fact that he was the one who administered the fatal injection to Flood.  (ROA.305.)  The court detailed information from various police reports to discuss Bartosh's state of mind and despair following

Flood's death, and it did so because it "concluded that his death, as well as the death of Brianna, was the result of the purchase from the defendant of the heroin that Reed purchased on November 30, 2017." (ROA.308.)

The court adopted the PSR and addendum with the modifications or additions it made during the hearing. (ROA.308-09.) It pointed out the PSR's conservative estimate of Robinson's drug activities, discussed the volume of customers he kept for a variety of drugs, and remarked that Robinson "was running a virtual supermarket of different kinds of drugs, and all of that was criminal activity on his part." (ROA.310.)

The court observed that Robinson "had unusual methods of distributing his drugs and encouraging people to bring him new customers," referring to Robinson's offer to give Bartosh drugs if he referred new customers and his instructions to find new or return customers by passing out his phone number among recovering addicts at methadone clinics. (ROA.310-11.) Robinson also enlisted his half-brother to assist him in drug trafficking. (ROA.311.) The court added that the PSR could have placed more emphasis on the fact that Robinson was distributing firearms in conjunction with his drug-trafficking activity. (ROA.311.)

Having adopted and supplemented the PSR, the court held that Robinson's advisory guidelines range was 151 to 188 months, but it referred to

its tentative conclusion that a higher sentence might be appropriate, specifically referring to the possibility of an upward departure under USSG § 5K2.1 because a death resulted from Robinson's conduct. (ROA.312.) In fact, the court noted, "[t]wo deaths did result from the defendant's conduct." (ROA.312.) While a departure could result in a guidelines range well above the 188 months, it observed that a variance was available too. (ROA.312.)

In addressing the court, Bartosh's father confirmed the court's finding that Bartosh never got over Flood's death and requested "anything that you can give to this animal" to prevent him from hurting another family. (ROA.313-14.) Bartosh's mother, a teacher, noted the prevalence of the "tragedy" that drugs have caused in society and encouraged Robinson to implore those he recruited to stop selling drugs. (ROA.314-15.)

Defense counsel's sentencing argument was brief: "Your Honor, at this time we only ask for a within guideline sentence. We have nothing else to say." (ROA.315.) Robinson declined to allocute. (ROA.315.)

The court observed that the maximum sentence was 480 months. (ROA.316.) Although it considered such a sentence appropriate, it explained that it chose not to go that far. (ROA.316.) Instead, it imposed a sentence of 340 months, which it deemed a variance from the guidelines, and a seven-year term of supervised release. (ROA.316.) In assessing Robinson's history and

characteristics, the court reiterated that he operated a deadly "superstore of drugs," encouraged others to bring new customers to him, and had been doing that for years. (ROA.317.) The court considered Robinson's conduct "very serious activity" and expressed its concern that he would continue "to engage in it if he didn't receive a very significant sentence of imprisonment." (ROA.317.) The court was troubled by his criminal history, including his prior conviction for possession with intent to deliver, a possession offense in which he was armed with brass knuckles, his gang membership, and his repeated failures on probation and on parole. (ROA.317-20.) It discussed another prior offense in which Robinson pointed a gun and threatened to kill the victim, but the victim refused to cooperate out of fear for his life. (ROA.320-21.) In another unadjudicated offense, a woman told police that Robinson punched her twice in the face, spat on her, punched her in the stomach, choked her, and threatened to shoot her. (ROA.321.) That victim suffered a miscarriage the next day. (ROA.321.)

The court then restated its findings with respect to the drugs Robinson supplied that caused Flood's and Bartosh's deaths. (ROA.322.) Even if it had not made a causation finding as to Bartosh's death, the court stated that Flood's death was at least a factor in Bartosh's decision to kill himself, and the court would have imposed the same sentence even if it had not considered it a

but-for cause in Bartosh's death: "I would have imposed the same sentence, even if I had not made the definitive finding about the causation between Reed Bartosh's suicide and the heroin that the defendant supplied to Reed Bartosh and Brianna." (ROA.322.)

After completing its pronouncement of the sentence, the court further explained that the two deaths resulting from Robinson's conduct went to the seriousness of the offense. (ROA.324.) It stated that the sentence was "absolutely necessary in the hope that it will promote respect for the law by others who might be inclined to engage in the same kind of conduct," provided just punishment, and deterred future criminal conduct by Robinson. (ROA.324.) Although the court remarked that it had some misgiving about imposing a sentence below the statutory maximum, it added that it had considered the guidelines range. (ROA.325.)

## SUMMARY OF THE ARGUMENT

Robinson acknowledges that the district court acted reasonably in imposing an upward-variance sentence based on his provision of the drugs that killed Brianna Flood. His sole contention on appeal is that the court erred by imposing a sentence that considered him to additionally shoulder some culpability for Bartosh's suicide. The court, however, did not abuse its discretion in sentencing Robinson (or plainly err by considering Bartosh's death).

The district court considered multiple factors when it fashioned Robinson's sentence, each of which was moored to a sentencing factor in 18 U.S.C. § 3553(a). In addition to the two deaths precipitated by Robinson, the court noted the wide extent of his drug sales—running a "virtual supermarket" of drugs—and his predatory tactics that included recruiting others to target recovering addicts to find new customers. The court also cited Robinson's involvement in firearms sales along with drugs, episodes of extreme violence, and his consistent failure to be deterred or to comply with community supervision. All of these aspects of Robinson's characteristics pointed to a sentence above the guidelines. The court also took notice of the devastation wrought by heroin, which, coupled with the two deaths tied to Robinson's heroin, spoke directly to the seriousness of the offense.

Robinson's arguments in evasion of responsibility do not demonstrate that his sentence is unreasonable. The court did not overemphasize its conclusion that Robinson's drugs were at least a factor in Bartosh's decision to kill himself. Viewed in context, Bartosh's death was just one of numerous reasons for the sentence cited by the court. And the contention that his role in Bartosh's unraveling dissipated during the six months between the two deaths falls apart in light of the fact that Robinson continued to supply Bartosh with heroin and, in that way, helped fuel Bartosh's deterioration. Robinson's

arguments portraying Bartosh as solely responsible for his own death reveal a drug dealer's willful blindness to the effects of his crime.

At bottom, Robinson's arguments are simply a request for this Court to come to a different conclusion about what is an appropriate sentence. That is not the role this Court plays in substantive-reasonableness review.

## ARGUMENT AND AUTHORITIES

**1.  The district court did not abuse its discretion in selecting the sentence imposed.**

### Standard of Review

Robinson asked the court to impose a within-guidelines sentence but had nothing else to say with respect to his sentence. (ROA.315.)  That seemingly preserved a general challenge to the substantive reasonableness of his sentence under *Holguin-Hernandez v. United States*, 140 S. Ct. 762 (2020).  It did not, however, preserve a more specific claim that the district court erred by taking Bartosh's death into account when fashioning the sentence. *See id.* at 767 (Alito, J., concurring) (clarifying that the Court did not decide whether the defendant preserved any "particular" substantive-reasonableness challenge). Robinson never asserted that the district court could not consider Bartosh's death, nor did he object to the court's finding that Robinson's provision of the heroin that killed Flood was at least a factor in Bartosh's suicide. (*See* ROA.322.)  Any more particularized claim should be reviewed for plain error

only.  In any event, the district court's sentence should be affirmed under either standard of review.

When assessing the substantive reasonableness of a sentence, the Court considers whether the district court abused its discretion.  *United States v. Nguyen*, 854 F.3d 276, 283 (5th Cir. 2017).  Robinson may show such an abuse in imposing the non-guidelines sentence by establishing that the district court "unreasonably fail[ed] to reflect the statutory sentencing factors" of 18 U.S.C. § 3553(a) by (1) "not account[ing] for a factor that should have received significant weight, (2) giv[ing] significant weight to an irrelevant or improper factor, or (3) represent[ing] a clear error of judgment in balancing the sentencing factors."  *Id.* (internal quotation marks omitted).  That this Court might have imposed a different sentence is insufficient to justify reversal, as substantive-reasonableness review is highly deferential to the district court's decision.  *Id.*  "Thus, a 'significant variance' from the Guidelines is permitted where it is 'commensurate with the individualized, case-specific reasons provided by the district court.'"  *Id.* (quoting *United States v. Diehl*, 775 F.3d 714, 724 (5th Cir. 2015)).

## Discussion

### A. In imposing a variance sentence, the district court cited numerous reasons relevant to the statutory sentencing factors.

The district court did not impose a substantively unreasonable sentence. To the contrary, it provided an exhaustive explanation for its decision to impose a sentence that it recognized as a significant upward variance from the guidelines range. The guidelines did not account for the important fact that Robinson's heroin killed Brianna Flood, and Robinson recognizes that the court was reasonable in holding him accountable for that. (*See* Br. at 7.) But there were many more aggravating circumstances the court considered appropriate for a longer sentence. Robinson operated a "superstore of drugs," and used or sold a number of firearms that the court considered useful for furthering additional drug-trafficking operations. (ROA.311, 317.)

The court considered the longer sentence appropriate, too, based on Robinson's aggressiveness and apparent heartlessness in expanding his customer base by incentivizing purchasers to bring him new customers, such as his promise of free drugs for referrals and his instruction to target recovering addicts at methadone clinis as sales opportunities. (ROA.310-11.) By exploiting the greatest weakness of recovering addicts for financial gain, Robinson evinced a particularly reprehensible level of predation that marks him among the worst of drug dealers. And, the court concluded, it was even

more egregious that he was recruiting others to engage in his illicit business. (ROA.311.)

Bartosh was one of those addicts who had tried to get clean but failed. And even after Robinson assisted in Flood's killing, Robinson made himself available to continue profiting from Bartosh as he spiraled downward to his own demise. (*See* ROA.305, 371, 417.) If there was anything to offset a view of Robinson as a callous profiteer at the expense of addicts, it is not contained in this record, as Robinson declined opportunities to apologize or express even a modicum of remorse about his conduct or its consequences. (*See* ROA.315, 369.[3]) *See United States v. Nevarez-Arreola*, 885 F.2d 243, 247 (5th Cir. 1989) (observing that the defendant's refusal to allocute supported the conclusion that the defendant did not accept responsibility for his offense).

And even still, these were not all of the reasons why the court considered the substantial upward variance appropriate. The court paid particular attention to the destructive effects of heroin addiction in the country, (*see, e.g.*, ROA.79-80, 94-109), and a toxicologist testified that the drug Robinson supplied was unequaled locally in the number of deaths it caused, (ROA.299-300). The court noted Robinson's violent tendencies as well, such as an

---

[3] Notably, when the probation officer inquired about his guilt, Robinson did not manifest any appreciation for destruction and havoc his offense brought upon the lives of others. Instead, he mentioned only that the offense "set [him] back in life." (ROA.369.)

offense in which he pointed a gun at his victim, threatening to kill him, but apparently was not prosecuted because the victim feared for his life if he cooperated. (ROA.320-21.) And Robinson brutally beat a pregnant woman who suffered a miscarriage the following day. (ROA.321.)

The district court also noted Robinson's inability to be deterred from unlawful conduct and his repeated failure to comply with supervision. It pointed out that, at age 25, he admitted to arresting officers that he was only one week removed from prison. (ROA.319.) And he was not deterred by a couple of pleas in bar that allowed him to avoid additional convictions. (ROA.319-20.)

This record demonstrates that the district court reasonably took into consideration numerous egregious aspects about Robinson and his offense, beyond his contribution to Bartosh's death, when it chose to impose the upward-variance sentence. In view of the laundry list of reasons for this upward-variance sentence, each one relevant to a sentencing factor, it is unsurprising that Robinson provides no cases in which the Court has held in similar circumstances that a sentence represented an abuse of discretion.

### B. Robinson's argument asks the Court to reweigh a single aspect of the sentencing factors and come to a different conclusion about an appropriate sentence.

Robinson peddled drugs without a care about the consequences that others might bear. Now that he has been sentenced; however, he contends that

the district court was constrained in its ability to hold him accountable for the natural and foreseeable consequences of his offense. (*See* Br. at 14 ("[H]e should not be held responsible for the actions a buyer took in remorse.").) Yet his attempt to evade responsibility is supported by nothing—no cases and, in fact, no compelling facts. He provides no indication that the district court placed significant weight on an impermissible factor, failed to consider a mandatory factor, or clearly erred in its balancing of the relevant factors.

Robinson mistakenly suggests that the district court "gave just as much attention" to Bartosh's death as it did Flood's. (Br. at 9.) But based on Robinson's objection, the court presided over a fulsome evidentiary hearing with multiple medical experts concerning whether the evidence supported but-for causation for Flood's death. Robinson seemingly criticizes the court for entering several items into the record to support its finding that Robinson's conduct contributed to Bartosh's death, as though ensuring an accurate record should raise eyebrows, but it is likely that Robinson would have been attacking the court's findings as clearly erroneous had the court been less clear about the bases for its decisions.

Robinson's attempt to show that the district court abused its discretion with respect to his culpability for Bartosh's death also pales in light of the court's complete explanation of its sentence. As is evident from the discussion

above, Bartosh's death was just one part of an extraordinarily long list of reasons why the court considered the substantial variance appropriate, no other parts of which he contests on appeal, including:

- His conduct was a but-for cause of Flood's death.

- He sold several different drugs—and firearms—for years.

- He preyed on addicts and used them to expand his sales and profits, undermining their rehabilitation.

- He peddled a poison that has been particularly destructive both locally and nationally.

- He had a history of violence.

- He was undeterred by prior convictions and had a uniformly poor record of compliance with community supervision.

When the entirety of the court's reasoning is considered, it becomes clear that Bartosh's death was just one of several factors in the decision to impose the upward-variance sentence. The court did not clearly overvalue it or treat it unreasonably.

Robinson asserts that the passage of time—six months—between the two deaths dissipated any culpability he had for the latter, Bartosh's death. He provides no examples, however, in which this Court has shielded drug dealers in this way from the natural and ordinary ripple effects of their conduct. Any slight force that argument might have had if Robinson parted ways with Bartosh after the overdose vanishes in light of the fact that Robinson continued

supplying Bartosh with heroin after Flood's overdose, thus fueling Bartosh's

demise.  (*See* ROA.371.)

Robinson also doubles down on his victim blaming by asserting that

Bartosh's death was the result of his independent decision, which severed

Robinson's liability.  Again, his assertion is not supported by any cases

showing that what the court did here was error.

In the absence of any showing that the district court clearly erred in its

balancing of the sentencing factors, it becomes evident that Robinson's appeal

is merely an invitation to have the Court step into the district court's station,

reweigh the sentencing factors, and come to a conclusion that is more

favorable to him.  The court has repeatedly warned that it does not accept such

invitations, even when it considers the sentence imposed "severe."  *See, e.g.,*

*United States v. Oladimeji Seun Ayelotan,* 917 F.3d 394, 409 (5th Cir.), *cert. denied,*

140 S. Ct. 308 (2019).

# CONCLUSION

This Court should affirm the judgment.

Respectfully submitted,

Erin Nealy Cox
United States Attorney

*/s/ Brian McKay*

Brian McKay
Assistant United States Attorney
Texas Bar No. 24046395
1100 Commerce Street, Third Floor
Dallas, Texas 75242
Telephone: (214) 659-8600
brian.mckay@usdoj.gov

Attorneys for Appellee

# CERTIFICATE OF SERVICE

I certify that this document was served on Robinson's attorney, Matthew Wright, through the Court's ECF system on June 24, 2020, and that: (1) any required privacy redactions have been made; (2) the electronic submission is an exact copy of the paper document; and (3) the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.

*/s/ Brian McKay*

Brian McKay
Assistant United States Attorney

# CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 4,547 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Calisto MT font.

*/s/ Brian McKay*
Brian McKay
Assistant United States Attorney
Date: June 24, 2020